Good morning, your honor. Morning. May it please the court. My name is Vicky Lai and I represent the appellant, Gino Turrella. I'd like to focus with this court's indulgence on the sufficiency of the 924C claim and rest on our briefing with respect to the competency issue. The government admits that its expansive view of 924C liability is not only novel but unprecedented. The government's invitation to expand the statute to fit the facts of this case should be rejected because it renders possession and furtherance of and mere possession of a firearm virtually indistinguishable. To convict a defendant under 924C, the government must not only show that a particular firearm was possessed but that the defendant intended to use that firearm to promote or facilitate the underlying offense. In other words, whether the possession of a firearm is in furtherance of the underlying crime turns on the intent of the defendant. Here, the underlying crime is rather unusual. It's the sending of a long-distance email threat from the Seattle area to the Washington, D.C. area. The facts and evidence not only fail to show that Mr. Turrella possessed any particular firearm when he sent that email under an assumed identity from either the Highline Community College or the King County Library. The facts negate any intent on his part to use his own gun collection that was discovered three months later to further that threat. The government's brief completely ignores and does not even mention the key fact in this case. Mr. Turrella, it ignores that Mr. Turrella sent the email not as himself but posing as his former supervisor, James Ackerman, in order to get James Ackerman in trouble. That fact by itself negates any intent on Mr. Turrella's part to use his own guns to further the threat he sincerely believed and wanted the recipient of the email to believe that it was Mr. Ackerman and his fictional gun that Mr. Ackerman had sent the email, not Mr. Turrella. Counsel, let me ask you a question about that. The jury convicted your client of sending those emails in someone else's name. Yes. There's been no appeal from that. So as far as this court is concerned, we have to accept as true that he's the one that sent the emails with the threats. Is that true? Yes, that he did send the email, but the elements of an 875C claim is just that a threat was made and that it was transmitted. The facts of the underlying offense, though, was that he sent, which is not an element, is that he sent the email posing as someone else. But we know we have to accept that he's the one that sent the email. Right. Also, he sent other emails which contained bullets that fit into a .45. Isn't that true? No, he sent mailings earlier. With bullets? With bullets from an AK-47. And the record showed, the jury inferred from the record, that he's the one that sent those bullets. Isn't that true? Yes. The record also shows that on one occasion he threatened other people. He said, do I care about the consequences of the email? No, just come and try to do something about it. I'll drop you like a sack of four-letter word with my .45. Right. The jury heard that as well. Well, that was the email that was sent in the name of Mr. Ackerman. And I think what Your Honor is focusing on is on what the recipient was thinking. But in order to convince – I'm looking at what the jury had before it and what they could infer from the evidence as to whether your client possesses .45 in furtherance of the threats. Well, what the jury had to decide was whether my client had the intent to use his own .45s, which were discovered three months after the threat was sent, to promote, facilitate, or advance the crime. That was what the jury instruction instructed. In this case, because he sent the email with the intent that the recipient would believe that it was Mr. Ackerman who sent the email, the gun referenced in the email is completely fictional because Mr. Ackerman does not own a gun. Were you able to argue to the jury that your client didn't intend to injure the recipient of the email? This is a very confusing case. It is confusing. I wasn't the trial counsel, but the issue, I think, the defense was that he did not send the email. Okay. Here's a question I've got. So I would understand it if your client threatened someone and also told the person they threatened, I have a .45 or I have another gun, that that would enhance the threat. Yes. And that would be easy to show that sufficient evidence for this crime. But I have some concern for the government's position. I guess I'll ask the government to respond to it as to how if your client sends an email pretending to be Ackerman, not in his own name, and it makes threats, the threats don't identify him as the person threatening, how his telling other people he's got .45s enhances the threat. And that's my point. Your position. Yes, that's my position, that because liability under 924C requires that the jury find that the defendant possessed the intent to use his own firearms to promote or advance the crime. In this case, he had no intent to use his own firearms because he was posing as someone else. And at ER 98, the government explained in its closing, Mr. Torella did so because he wanted to get Jim Ackerman in trouble. And the only way Jim Ackerman gets in trouble is if the threat is taken seriously. Yeah, well, the... If I could just... Sure, go ahead. On your theory of the case, there are convictions that have to be sustained, right? Yes. But which convictions are sustained and which are reversed? You would... The 924C is reversed. It should be reversed. Wasn't there another conviction? Well, he was punished and convicted for identity theft, for stealing the identity of Mr. Ackerman. So that... That is true. Under your theory, those convictions would not be altered. You'd just have to vacate and remand for resentencing. On the 924C count. Yeah, yeah. Could you just answer one more question for me? Yes. Because I'm unclear as to how this got raised in the district court. Was it on the motion JNOV or acquittal or what? It was a Rule 29 motion. Okay. I'd like to reserve the rest of my time. Thank you. Good morning, Your Honors. May it please the Court, Arvind Swaminathan of the United States Government on behalf of the FBI. Counsel, the problem on my mind, just to let you know, you address it any time you want. I'm asking myself, how can his disclosure of his gun collection enhance a threat that he's making under a false name? Start with the context, Your Honor. This is the defense's first threat. And when he makes this threat, he knows that, of all people, Seltzer is going to figure it out. And he intends Seltzer to know it's coming from him. The reason he sends it under Jim Ockerman's identity is to give him plausible deniability. He doesn't want Seltzer to be able to prove it's him. He wants the ability to say, that's not me, that's Jim Ockerman. It's Jim Ockerman's email address. And that's completely consistent with all of the evidence in the case, Your Honor. Remember, Seltzer was the one who figured out that the defendant had sent the graffiti threats and the bullet threats initially. And those were far harder to detect than the email threats. And Seltzer's the one who got him fired. If he really wanted Seltzer to be afraid in sort of an innocent world, he would have never chosen Jim Ockerman. He chose Ockerman because he wanted to give the target, Seltzer, clues that it was him that was making the threat. So I wondered about that. Was that argument made to the jury? Was it argued to the jury that when he sent the email in Ockerman's name, he knew that Ockerman would figure out it was him? And so telling Ockerman that he's got lots of guns enhances that threat? I don't think in closing… As in Seltzer, rather. Yes, Your Honor. I don't think in closing it was articulated that carefully. But let me go to what the jury's questions, because I think those are enormously probative of what was on the jury's mind. This only works in this context. This theory only works if the defendant knew that Seltzer was going to figure it out. And the jury in two jury questions that they asked, they asked precisely this question. Can somebody making a threat in somebody else's name intend for that person to be fearful of the actual person making the threat? And then they asked a question about whether if you possessed a firearm in this context, could it be used to further the crime of violence? You know, a lot of times in these sufficiency of evidence cases, we don't know what exactly the jury was thinking. This is one of those unique moments where we know exactly what was going on in that jury room because the jury came out and asked those questions. They then deliberated further and came to this conclusion that is entirely consistent with all of the evidence, which was that the defendant intended Seltzer to understand this threat. Getting Jim Ackerman in trouble on that very first email is an ancillary benefit. Because look at what the defendant does after that. He begins to then send a series of emails to more or less random people at Boeing that Jim Ackerman probably doesn't know. Because at that point, he's figured out, hey, this is not a bad plan. I can also get Jim Ackerman in a lot more trouble. I'll start spinning off these threats. Who was the target of this thing? Was it Ackerman or Seltzer? It was both, Rara. I mean, ultimately, it's both. And I think that the first initial one is Seltzer. The animosity the defendant maintained for Seltzer years and years after he had been fired is obvious in the emails that he sends two years afterwards in 2007. It's also obvious when he then starts to threaten Seltzer in 2008 to intimidate him. And that email is written very personally. And the tone and the language and the content of that email bears a lot of resemblance to previous threats. Okay. So the theory is that he starts out sending this in Ackerman's name to Seltzer. He figures that Seltzer will figure out that it's really him because he knows he doesn't like him. Then he's having so much fun doing this that he figures that he can get Ackerman in trouble, too. Exactly, Rara. And if you look at the content of emails, they're basically cut-and-paste jobs. Okay. Now, when this was raised on the Rule 29 motion, do you agree that that's when this was raised? The Rule 29 motions were very nonspecific. They were just basically blank Rule 29 motions saying we challenge the sufficiency of the application. Well, did the district court ever address this very point, then? I don't think in the written order that the district court entered it was addressed this precisely. I don't think anybody – there was no argument either at the end of the government's case or then in briefings subsequent that this theory was not flushed out or that these theories were incompatible. All that was raised was a very generalized, we have a Rule 29 motion, and there were really no bases for it at all. Did you try the case? I did, Your Honor. But to go back to that, to say one more thing about that is the defendant at that point, look at the next two threats that he sends that have nothing to do with Shimokamon. In that situation, that all he's trying to do is get Jack Delio in trouble. And you can see the evolution of what the defendant has done. The first is, I want to scare Seltzer. Hey, I'm getting Shimokamon in trouble. This might not be such a bad idea. And then he begins to get Akerman in trouble by sending these cut-and-paste emails, essentially, to a variety of other people. And then he decides, hey, this is not such a bad idea. I'm going to do it with Jack Delio. And so, you know, remember, the defendant had contact with Seltzer. Seltzer is the one that figured out that he was doing the graffiti on the bathroom walls and that he was also sending those letter threats. And so I'm going to be a little confusing, but the defendant knew Seltzer knew. The defendant gets fired right after that interview in March of 2005, but Seltzer, when he challenges him, the defendant slips up and says something to the effect of, you can't make me write what's in my notes. Oh, I mean those notes, when Seltzer had never showed him the notes. So the defendant at that point has essentially tacitly admitted to Seltzer that he was responsible for those bullets. And so that's a key piece of information because the defendant knows Seltzer's smart. He knows Seltzer's an experienced investigator who has caught him before. And it is a small logical leap that he's going to catch him again. He just wants to be able to have plausible deniability, essentially not to get in trouble for it. So the government has to show some nexus between Mr. Torello's gun collection or ownership of guns in this offense. Absolutely not. The nexus here, as I understand your argument, is that he knows that the security person will figure out he's doing it, and he tells that person he's got these guns? That is the nexus, Your Honor. But let me add one additional layer to that. Remember, the defendant has a history of making these escalating threats, all of which reference firearms. And the bullets that he sends to Ackerman are particularly relevant because in that instance, the defendant is using firearms, ammunition, the idea of gun violence to scare somebody. So you want to know what's in the defendant's mind when he has all these firearms, and he begins sending threatening people. You know because he's already done it before. He did it when he sent those letters. He sends bullets, which the only conceivable theory was he's trying to scare Ackerman when he sends bullets and powder designed to look like anthrax. So when the defendant does that, he's showing that his intent is to scare Ackerman with the mention, with the use of firearms. It is then a very small logical leap to get to the idea that the defendant will use his possession of firearms to scare somebody else because he's already done it. Okay. Could you address just in 30 seconds the competency? That was not argued, but it is raised. I'm not surprised there was a competency hearing here. Yes, Your Honor. The question in the competency hearing wasn't his ability to understand the proceedings. It's just his ability to assist. The key in the competency hearing is that the defense experts have the standard completely wrong. And you know that if you look at the excerpts of record 260 and 266, the supplemental excerpts, because what the defense expert says is at the point that the defendant says he trusts what my attorney recommends, I think he's competent. That's not what the standard is. And he says it again later on. Essentially, I only think somebody's competent if they can accept their attorney's advice, and that's not the test of competency. But beyond that, Your Honor, there were a number of credibility problems that the defense expert had on the stand. He made a number of admissions that the defendant wasn't delusional. He made a number of admissions that a series of different trial strategies that the defendant had were all rational. And ultimately, the court chose to choose one expert over another. It's hard to say that that's clearly erroneous. There wasn't just one expert and the court went the other way. He had two competing experts. He heard two days or two half days of testimony, and based on credibility findings in the cross-examination, found that the defense expert wasn't credible essentially. I have one final quick question. To sustain the 924 conviction, is it sufficient if you didn't have the guns but you just have the gorilla possessing those bullets, the AK-47 bullets? I don't think so, Your Honor. And I think the way the statute is worded is it's a firearm. It's not just ammunition. So he had to possess those firearms. And if I make a quick comment, he admitted to having those firearms in 2005 when he was interviewed, and then lo and behold, in 2008, he actually has those firearms. He sent the bullets in 2004, and when they searched his house in 2008, lo and behold, he has those same kinds of bullets. There's no question he possesses the firearms. It's just a question of whether when he disguises his identity, that means they're being used for this crime. Thank you, Your Honor. Thank you. I don't have that much time, so I'd like to just point out that the government's current theory that Mr. Torella was posing as Mr. Ackerman so that the recipient would think it was him, but then he could, I suppose, get off because he sent the email as Mr. Ackerman was never argued to the jury. At ER-92, this was the argument that was presented to the jury. Ladies and gentlemen, why did he make threats in their names? What was the purpose of that? The purpose was to get them in trouble, to have an investigation started, maybe jeopardize their job. And why did the defendant think that would be the response? Why did the defendant think that that was what would happen if he made threats in Jack's name and in Jim's name? Because that's what happened to the defendant when the defendant was suspected of making threats. And how do you address the questions that the government's counsel says were asked by the jury after they started deliberating? Well, the jury was obviously confused because the government's argument was that the whole thing is confusing because 924C liability doesn't fit these facts. And the jury was obviously confused with trying to put 924C liability in what they were told to find, which is that the firearms that were found in this legitimate gun collection somehow advanced, furthered, and promoted this threat, this one threat, not all the other threats, when it was made in someone else's name. So the question that they asked was, if you send a threat in someone else's name, is that like sending a threat in your own name? I get it. But under Jackson v. Virginia, isn't the question we have, in substance, could a rational jury have had in mind the theory that the government advances? No, I don't think any rational jury of fact could have found under these facts that Mr. Torella had the intent to possess his legitimate gun collection to further the threat when he made the threat in someone else's name, as the government argued to the jury solely to get the person he was impersonating in trouble. It wasn't to use his guns to threaten. Okay, we'll review the record carefully. Thank you. Appreciate the arguments presented. The case just argued is submitted for decision.
judges: Schroeder, Alarcon, Gould